*284 Dissenting Opinion.
Fenner, J.
Appreciating the great importance of these cases, I have carefully examined every ruling of the judge a quo and every one of the numerous bills of exception presented on the record.
I agree with the majority in considering that the pivotal question in the case is that which is so denominated in the majority opinion, viz : the admissibilhw of evidence to show the existence of immoral and scandalous relations between Dupléeliin, the owner of the house invaded, and a colored woman named Filie.
Repeated attempts were made to get in such evidence in various forms and under different pretexts, whicl^ were all defeated by the judge, and the records bristle with bills of exception on the point. In one of these bills the judge states at length the circumstances of the case and the grounds on which he based his ruling, and I deem it best to quote this bill almost in full.
The following question was propounded to a witness for the defence:
“ If you say you wanted to make Filie go away from the prosecutor’s house, give your reasons for wanting Filie to go away from the prosecutor’s house.” The bill proceeds: “It was declared by defendants’ counsel at the time that their reasons for asking this question were:
1. “ For the purpose of showing that the entry was not made with intent to kill, as charged.
2. “For the purpose of.showing that the entry was not made with intent to kill, steal, rob, commit a rape or any other crime set out in the statute. But his honor, the judge, upon objection made, ruled out the question on the ground that Leo val Méche, one of the co-defendants, who had been placed on the stand before Jerome Meche, another of the co-defendants, was asked the following question: £ If you say you wanted to make Filie go away from the prosecutor’s house, give your reason for wanting her to go away.’ Whereupon the court ordered the jury to retire and the question to be answered in their absence, for the purpose of determining whether it was admissible or not before it should go to the jury. The witness answered this question as follows, which was taken down in presence of accused and of all parties by the clerk of court: £ Blanc Beard told me Filie had fought with one of his (Blanc Beard’s) sisters-in-law. Also *285 because there was bad examples in the house of Mr. Dupléchin; that Filie closeted herself with Mr. Dupléchin in the day time in a room in his house; also that one of Mrs. Blanc Beard’s sisters had told her, crying, that they were maltreated on account of Filie. Also Joseph Méche told him (witness) that Mrs. Blanc Beard told him that she would be glad if they would make Filie leave the place on account of her sisters. Also Leoval Cormier told me he went to Mr. Dupléchin and that he saw a large mulatto man in the house playing with his daughters, and he understood Filie was the cause of the mulatto being there — he, Cormier, himself thought it was a bad example. Some of the crowd perhaps did not know these reasons, but most of them did.’
“It will be observed,” proceeds the judge, “that the questions propounded to each of these witnesses are identical, and evidently asked for the purpose of eliciting the same kind of testimony as appears above. It must be evident that such testimony was intended rather for the purpose of appealing to the race prejudices of the jury than of showing want of intent to kill. That, considering the statements as true, they are inadmissible either in justification or in mitigation of the offence charged. It is composed entirely of hearsay, and would have inevitably led the court into an investigation of irrelevant matters, well calculated to mislead the jury. In other words, this was the real purpose of asking the question. The circumstances attending the commission of the offence, as detailed by all of the accused themselves on the witness stand are briefly as follows: That they, or a majority of them, belonged to an unlawful organization called ‘ Regulators,’, or ‘White Caps;’ that they armed themselves with pistols and guns, and went in a body to the house of Dupléchin about 1 o’clock in the night; that all were masked except one, a comparative stranger in the neighborhood, named Falgout, totally unknown to Dupléchin; that Falgout, a member of this body, representing himself as a sheriff to Dupléchin, induced him to open his window; that he demanded of Dupléchin the woman Filie; upon being asked what he wanted of her, said it was none of his business; that immediately thereafter Falgout jumped through the window of Dupléchin’s house across his bed, and presenting his pistol at Dupléchin, ordered him not to move, immediately shouting to Ms confederates ‘ Break, enter! I hold him; ’ that immediately afterward several members of the party, having secured entrance, *286 caught and dragged the woman Filie out of the house; that about this time, Dupléchin having secured possession of his gun, snapped it at the party who were engaged in dragging the woman Filie away in his yard. The gun having failed to fire the first shot, he fired the second shot, which was almost simultaneously returned by the party having possession of Filie, resulting in Dupléchin being shot down in his own house, and one of the accused being wounded in the leg; that, immediately thereupon, the accused fired some five or six shots in the house, after which they left. * *
“In view of these facts, the court felt constrained to believe that the evidence sought to be elicited by this question was offered for the purpose and with the hope that the jury, acting under a sense of indignation at a supposed outrage upon the domestic relations of one of their neighbors, would, upon the impulse of the moment, forget the issues of the case and justify the commission of the offence by an acquittal.”
Under the foregoing statement, did the judge err in excluding the evidence offered?
It is the plain and reasonable rule of law, that in criminal as in civil cases evidence must be confined to the issue, and proof of collateral facts is not admissible unless clearly referable to and bearing upon the point in issue.
“This rule,” says Mr. Greenleaf, “excludes all evidence of collateral facts or of those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute, and the reason is, that such evidence tends to draw away the minds of the jurors from the point in issue, and to excite prejudice and mislead them; and moreover, the adverse party having had no notice of such a course of evidence, is not prepared to rebut it.” 1 Greenleaf Ev., Sec. 52.
The points at issue in this case could not be more fairly and fully stated than they were by the judge a quo in his admirable charge when he said:
“To convict the accused of the crime charged, the State must show:
1. “That the defendants did enter and break.
2. “That the accused entered and broke a dwelling house.'
.3. “ That such entry and breaking was done in the night time.
*287 4. “That there was some person lawfully in said house at the time -of such entry and breaking.
5. “That the accused were, at the time of such entry and break - -ing, armed with a dangerous weapon.
6. “That the accused entered and broke with the intent to kill. * * * You can not legally convict the accused under the indictment for entering and breaking with intent to rob, to steal, to commit rape, or any other crime than the one charged, to-wit, the intent to kill.”
It is readily apparent that the evidence excluded had no possible relevancy to any of the above points, unless it be to the last, to-wit, the intent to kill.
If the matter in dispute had been whether or not the accused went to the house of Duplechin for the purpose and with the intention of taking out and whipping the woman Filie, the evidence might have been germane to such an issue, as tending to exhibit a motive for •such intention and to make it probable. But we do not understand there was any issue on this point. The recitals of the bill, as well as the judge’s statement and indeed the whole record, and even the briefs of defendants’ counsel, abundantly show that evidence of such intention was freely admitted and that it stood, substantially,, as a
• conceded fact in the ease. The question was whether the admitted ■intention and determination to take out and punish Filie was accompanied with a coexisting intention to kill whoever might resist them ■in executing that purpose.
“It is immaterial,” says Mr. Bishop, “in a criminal ease, what ■motives may have operated on the mind of an accused, or what may have been inoperative, provided the law’s motives did or did not influence him. Suppose a man has several intents, and in pursuance •of them, together moving him, he does what the law forbids. The rule here is, that if there are the intents necessary to constitute the ■offence, and intents not necessary, the latter do not vitiate the former, which in their consequences are the same as though they stood .•alone.” Bishop, Or. Law, Sec. 889.
Admitting, therefore, that accused went with the intent to take ■out and punish Filie — an intent certainly unlawful — yet if that intent was accompanied by an intent to kill either Filie or any other person who might lawfully resist them in the accomplishment of that purpose, the crime charged would be established.
*288 The facts stated by the judge show that the accused masked and. armed themselves with dangerous weapons, that the first one who-entered covered Dupléchin with a pistol and told his confederates, to break and enter; that while Dupléchin was thus held under-threat of death they did break, enter and seize and carry off the woman Filie; that when Dupléchin, in the exercise of his legal right and indeed of his manly duty, did resist by shooting at the invaders of his home, they fired at him and shot him down. Now, the jury was bound to determine what intent was evinced by such conduct. They had a right to consider whether covering Dupléchin with a pistol did not mean a threat and an intention to kill him if he resisted, although he had the clear legal right to resist even to the-extent o'f killing the intruders, especially when followed by the fact that when later he did resist they did shoot him down.
In such a case, how could it possibly avail defendants, under any-legal aspect of the ease, to show that the reasons why they determined to commit the unlawful act of taking out and punishing ■ Filie were the existence of shameful relations between Dupléchin, a white man, and Filie, a colored woman;. he keeping her as a concubine in the house with his white children, to the scandal of the neighborhood, and to the injury of his family? I can discover no possible light which such facts could throw upon the question, whether or not the purpose to remove and punish Filie, was accompanied by the coexisting determination, evinced by the facts stated, to kill whoever might resist them in carrying out their unlawful! designs. Indeed, it rather appears that the proof of such atrocious, and scandalous relations, as the motive of the crime, would tend more to render probable, than to rebut, the intention and determination to carry out their purpose, at all hazards, even though involving the sacrifice of human life.
I fully agree that the accused were entitled to prove their intention, and their whole intention, in breaking and entering the house; but the intention referred to means what they intended to do, and. not the reasons or motives why they intended to do it, unless such motives were such as made the act lawful, which is not here pretended. The law deals with acts and with intentions to act. When. the majority opinion affirms their right to prove that their intention-was “to break up the concubinage between Dupléchin and Filie fey taking out and whipping Filie,” it presents a compound idea,, *289 embracing, first, the intent, viz: to take out and whip Eille; second, the motive for that intent, viz: to break up the concubinage. As the motive had no tendency to legalize the act intended, it was not admissible, unless it tended to rebut or disprove the accompanying intent to kill, alleged in the indictment. It is very clear that this motive is not, in the slightest degree, inconsistent with the intent to kill. On the contrary, if their motive was to break up the concubinage between Dupléchin and Eille, the killing of either one, or both, would certainly be the most effectual and conclusive method of accomplishing that purpose. I have wrestled vainly in the attempt to discern any legal or possible aspect in which such evidence could throw any light upon the question of intent to kill vel non.
We are not here concerned with the sufficiency of the proof of intent to kill or of the qualities which must characterize such intent in a prosecution like this. The jury was fully charged that the intent to kill was absolutely essential, and that the breaking-entering must have been done with that intent, which imports that the intent must have existed at the time of the' breaking, and would not be established by proof showing that such' intent 'only originated out 6f emergencies arising in course of execution of a'different thing at first intended. The authorities quoted to that effect are good law, but I do not see their bearing on this case. ■ If the' accused had privately and secretly entered Dupléchin’s house to take out the woman; seeking to avoid conflict, and had made their demonstrations threatening his life, only because unexpectedly surprised by Dupléchin, in such case the intention to be deduced from'- such demonstrations might be held as arising only subsequently to the breaking and entering, and therefore not'within the purview of the statute. But here the hostile demonstrations were the first acts of" the accused, done deliberately at the moment of entry, and certainly whatever intent the jury attached to them was’ ah intent directly applicable to the entry and breaking. ' ' :
The testimony excluded being, in my opinion, utterly irrelevant to any legal issue in the case, I feel bound to give my unqualified approval to the firmness and courage with which the judge a quo resisted every effort or device to bring it before the jury.
The case belongs to a class of cases to which the reasons underlying the rule excluding such irrelevant testimony peculiarly apply.
*290 In the language of Mr. Greenleaf, it would have “tended to draw' away the minds of the jury from the point in issue, and to excite prejudice and mislead them.”
The opening of the door to evidence of this kind in such cases increases the difficulty, already great, of vindicating the law.
I think the judge rightly concluded that the purpose, so persistently pursued, of getting in such evidence, could only be to appeal to a “higher law” in the prejudices of the jurors, under which they might, in violation of their oaths, acquit, however clearly satisfied that the accused were guilty of the crime charged in the indictment, and denounced by the statute.
It is the first duty of the judiciary charged with the enforcement of the legislative will as expressed in the statute law, to discountenance and exclude all foundation for such appeals. Says Mr. Bishop:
‘ ‘ A man can not make defence in court that there is a higher law than the one there administered forbidding him to obey the law, further than it may tend to shake the legal validity of the latter. Upon this point Baron Hume observes: ‘ The practice of all countries, is agreed.’ The rule necessarily lies at the foundation of all jurisprudence.” Bishop Cr. L., Sec. 344.
To admit such evidence at all is to give an implied sanction to the jury’s weighing it as material to the case, and they are not likely to understand or be controlled by nice distinctions as to the purposes and effects to which it is to be confined.
I have scrutinized every bill in all the cases, and though some of them may exhibit trifling technical irregularities in the rulings of the judge, the matters involved are trivial and the errors too insignificant to affect the substantial merits of the case or to justify interference with the verdict and sentence.
I therefore respectfully dissent from the opinion and decree herein..